Pages 1 - 54

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               )
  VS.                          )    NO. CR 19-00178 VC
                               )
EVGENI KOPANKOV and EMANOEL    )
BORISOV,                       )
                               )
          Defendants.          )
_____)

                    San Francisco, California
                    Wednesday, February 2, 2022


**TRANSCRIPT OF REMOTE ZOOM VIDEO CONFERENCE PROCEEDINGS**

**APPEARANCES VIA ZOOM:**

For Plaintiff:
                    STEPHANIE M. HINDS
                    UNITED STATES ATTORNEY
                    450 Golden Gate Avenue, 11th Floor
                    San Francisco, California 94102
              BY:  **CHRISTINA T. LIU**
                    **ASEEM P. PADUKONE**
                    **ASSISTANT UNITED STATES ATTORNEYS**


For Defendant Kopankov:
                    LAW OFFICE OF JAMES A. BUSTAMANTE
                    1000 Brannon Street, Suite 488
                    San Francisco, California 94103
              BY:  **JAMES A. BUSTAMANTE, ATTORNEY AT LAW**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED REMOTELY BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
                       CSR No. 7445, Official U.S. Reporter

1   **APPEARANCES VIA ZOOM:**   (CONTINUED)

2   For Defendant Borisov:

3                              LAW OFFICE OF MICHAEL & BURCH
                               One Sansome Street, Suite 3500
                               San Francisco, California 94104
4                      BY:   **DAVID M. MICHAEL, ATTORNEY AT LAW**

5

6   Also Present:           **Maria Zolanovo**
                            **Catheryn Grier, U.S. Probation**
7                           **Maria Entchevitch, Bulgarian Interpreter**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **Wednesday, February 2, 2022**                          **9:13 a.m.** |

2                    **P R O C E E D I N G S**

3                         ---o0o---

4       (Defendants present via Zoom, out of custody.)

5       **THE CLERK:**  All right.  Calling Case Number 19-cr-00178,

6   U.S.A. versus Evgeni Kopankov and U.S.A. versus Emanoel

7   Borisov.

8       Counsel for the Government, please state your appearances

9   for the record.

10      **MS. LIU:**  Christina Liu for the United States.  Good

11  morning.

12      **THE COURT:**  Good morning.

13      **MR. PADUKONE:**  Good morning, Your Honor.  Aseem Padukone

14  for the United States.

15      **THE COURT:**  Good morning.

16      **THE CLERK:**  And for Mr. Kopankov?

17      **MR. MICHAEL:**  Good morning, Your Honor.  David Michael

18  appearing for Mr. Kopankov, who is present by Zoom and with an

19  interpreter.  And alongside him on the same Zoom camera is his

20  wife, Maria Zolanovo.

21      **THE COURT:**  Okay.  Hello, Mr. Kopankov.

22      **MR. BUSTAMANTE:**  Good morning, Your Honor.  James

23  Bustamante appearing on behalf of Mr. Borisov, who is present

24  via Zoom.

25      **THE COURT:**  Hello.

1          Hello, Mr. Borisov.

2          **DEFENDANT BORISOV:**  Hello, Your Honor.  Good morning.

3          **THE COURT:**  Okay.

4          **MS. GRIER:**  And Catheryn Grier with U.S. Probation.

5     Thank you.

6          **THE COURT:**  Okay.  So, Mr. --

7          **THE CLERK:**  Also -- sorry, Judge -- we need our

8     interpreter's appearance as well.

9          **THE INTERPRETER:**  This is Maria Entchevitch,

10    professionally qualified federal court interpreter for

11    Bulgarian.

12         **THE COURT:**  Hello.  So what I was going to ask is:

13    Mr. Borisov is not using the interpreter and Mr. Kopankov is;

14    is that correct?

15         **DEFENDANT BORISOV:**  Yes, Your Honor.

16         **MR. BUSTAMANTE:**  That's correct.  On behalf of

17    Mr. Borisov, the interpreter is not necessary, Your Honor.

18         **THE COURT:**  Okay.

19         **MR. MICHAEL:**  That's my understanding also, Your Honor,

20    that Mr. Kopankov will be using the services of the

21    interpreter.

22         **THE COURT:**  Okay.  And so -- but, of course, Mr. Kopankov

23    needs to be able to hear everything that is discussed with

24    respect to Mr. Borisov as well.

25         Okay.  First of all, I gather -- and I'm not sure if I

1   heard it from both defense lawyers; so let me just ask again.

2   I gather that both defendants consent to proceeding with their

3   sentencing hearings by Zoom.

4       **MR. BUSTAMANTE:**  That's correct, Your Honor, on behalf of

5   Mr. Borisov.

6       **MR. MICHAEL:**  And that's correct also, Your Honor, on

7   behalf of Mr. Kopankov.

8       **THE COURT:**  Okay.  So I find that it would unnecessarily

9   jeopardize the health and safety of those involved to hold an

10  in-person hearing today.  And the case has gone on long enough

11  that it is appropriate to proceed now by Zoom as opposed to

12  waiting until such time as we can proceed in person.  So we

13  will proceed.

14      And as I mentioned, I think it would be best probably to

15  start with Mr. Borisov.

16      So what I want to do is I want to go through the

17  sentencing hearing for Mr. Borisov all the way through

18  allocution; that is, all the way through anything that

19  Mr. Borisov would like to say; but then, before I hand down the

20  sentence, I want to go through the entire sentencing hearing

21  for Mr. Kopankov all the way through the point where

22  Mr. Kopankov says whatever he wants to say.  And only then will

23  I make a final decision about what the appropriate sentence

24  should be for both defendants.  Okay?

25      **MR. BUSTAMANTE:**  I appreciate that method, Your Honor.  We

1   have no objection, and I'm glad that the Court made that

2   choice.

3        **THE COURT:**  Okay.  So beginning with Mr. Borisov, on the

4   Presentence Report, with respect to the guideline calculation,

5   it sounds like what I need to do is adopt the calculation --

6   adopt the Presentence Report with an adjustment to the

7   guideline calculation as proposed by the parties.

8        **MR. BUSTAMANTE:**  That would be our desire, Your Honor.  We

9   have no objection to the Court, obviously, doing that.

10        **THE COURT:**  And --

11        **MS. LIU:**  Yes, Your Honor.

12        **THE COURT:**  Okay.  Sorry.

13        And then, so that the base -- the adjusted offense level

14   is what?

15        **MR. BUSTAMANTE:**  It would be 24, Your Honor.

16        **THE COURT:**  And the guideline range for that would be

17   what?

18        **MR. BUSTAMANTE:**  51 --

19        **THE COURT:**  Criminal history -- there's no criminal

20   history; right?

21        **MR. BUSTAMANTE:**  That's correct, Your Honor.

22        **MS. LIU:**  That's correct.

23        **THE COURT:**  Okay.  And so what is the guideline range for

24   that?

25        **MR. BUSTAMANTE:**  51 to 63 months.

1          **MS. LIU:**  And that's what I have too, Your Honor.

2          **THE COURT:**  Okay.  And then, if I recall correctly,

3     Mr. Borisov did not have any other objections to the

4     Presentence Report.  Is that correct, or did I miss something?

5          **MR. BUSTAMANTE:**  There's only one objection, Your Honor,

6     and it had to do with some material that was placed under the

7     category, paragraph 40, of "Other Conduct."

8          **THE COURT:**  Oh, yes.  Right.  The nightclub incident.

9          **MR. BUSTAMANTE:**  Yes.  That's the only objection.

10         **THE COURT:**  Okay.  And I guess I -- so, first of all, I

11    will say that I will adopt the guideline calculation that the

12    parties have proposed.  Okay?

13         And then, with respect to your one objection, I will say

14    that I -- you know, as a general matter, I believe it's

15    appropriate to consider evidence of other arrests or other

16    incidents.  And I think the fact that it wasn't in his RAP

17    sheet does not preclude me from considering it.  Obviously, you

18    give it less weight, substantially less weight if it's not a

19    conviction; but generally speaking, these things are

20    appropriate to consider.

21         However, I will say that as far as this incident goes, I

22    found the description in the Presentence Report to be a little

23    too vague to justify considering it.  And so I think if I am to

24    consider it -- and either way, it would be given relatively

25    minor weight because there's no conviction.  But if I am to

1   consider it at all, I think I need a more -- a stronger showing

2   from the Government and/or the Probation Office that, in fact,

3   it was Mr. Borisov who, you know, committed this crime or that

4   there's enough evidence to conclude that it's more likely than

5   not that Mr. Borisov committed this crime.

6        So, I mean, maybe I should hear first from the Government

7   on that issue.

8        **MS. LIU:**  Your Honor, the information that the Government

9   has is what's in the Presentence Report.  I understand that

10  there's not much more beyond that at the moment.  So I think

11  Your Honor has grasped the relevant --

12       **THE COURT:**  Okay.  So let me see.  Where -- what paragraph

13  is it again?

14       **MS. GRIER:**  Your Honor, it's 40.

15       **MR. BUSTAMANTE:**  Paragraph 40, Your Honor.  And the

16  response to the objection is in the first part of the addendum

17  to the Presentence Report, paragraph 3.

18       **THE COURT:**  Okay.  And I read that.

19       And so, Ms. Grier, do you want to kind of give a fuller

20  description of why you think that it would be reasonable to

21  conclude that it was the defendant who committed this offense?

22       **MS. GRIER:**  Your Honor, I understand your comment that you

23  don't believe the Presentence Report had enough information.

24  But I'm relying on that information in the Presentence Report,

25  and that is, the defendant was identified as somebody who

1  worked up the street; they knew him by the name of Boris.  The

2  police officer who was working there at the club also

3  identified him by his Facebook picture.  He was also identified

4  by this dark Porsche SUV that he was pulled over in a

5  few months later.  But also, if you look at his bankruptcy

6  documents, that same SUV is mentioned -- or, I should say, a

7  similarly described SUV is mentioned.

8      But I would also say, Your Honor, that I recognize that

9  leaving this in the report -- I know you mentioned it's not a

10  conviction but -- it does -- and I think this is why it's

11  important to maybe have this discussion -- it does weigh in in

12  terms of the BOP because the conv- -- I mean, the offense

13  itself is felony assault.  So while it has no bearing on his

14  criminal history points, it might have a bearing on designation

15  or security points or those kinds of things.  So I do think

16  it's important for that reason.

17      **THE COURT:**  Well, and, you know, the designation, of

18  course, is important.  But even aside from that, the question

19  is whether it goes into the, you know, overall mix of

20  information that's being considered in deciding how to apply

21  the statutory sentencing factors.

22      **MR. BUSTAMANTE:**  Your Honor, whenever the Court wants,

23  I've got just a couple of words to say about it.

24      **THE COURT:**  Okay.  So it says that (as read):

25          "On September 28, 2018, an Ohio State Police

1          Trooper conducted a traffic stop of the defendant,

2          who was driving a black Porsche SUV."

3          How long -- how far in time from that was the incident?

4          **MS. GRIER:**  It was three months apart, Your Honor.

5          **THE COURT:**  Three months apart.

6          Okay.  And was it in the same location?

7          **MS. GRIER:**  It was in the same state -- I mean, it was in

8    Ohio.

9          **THE COURT:**  I mean, so the fact that Mr. Borisov was

10   pulled over in a black Porsche SUV three months later, that's

11   relevant only because we're connecting him to the type of car

12   that was there at the nightclub.

13         **MS. GRIER:**  Correct.

14         **THE COURT:**  Okay.  All right.  Go ahead, Mr. Bustamante.

15         **MR. BUSTAMANTE:**  Thank you, Your Honor.

16         I'll start off by saying that the Court, in its initial

17   comments, is sort of on the right track.  And I've got two

18   concerns.

19         One is, you know, that the Court consider it at all in the

20   greater scheme of things in terms of who my client is and

21   making a determination of the appropriate sentence.

22         But equally important to us is the point brought up as

23   well that if this remains in his Presentence Report, it is

24   going to follow him to the BOP for purposes of classification.

25   And it may not qualify under the point structure that they use

1  for doing it, but it is information that they're going to

2  consider.  And there's a number of issues that the Court hit

3  on, but there's some additional ones.

4      Number one, this report is titled "Preliminary

5  Investigation Report."  There's no name of a victim.  We have

6  no identifying factors of who the victim is.  There was no

7  ability for us to do any follow-up investigation to the victim.

8  There's no medical report.  There's no police report that

9  was -- no supplemental reports where they followed up to

10  contact who they believed or thought was or suspected was

11  involved.

12      They made no effort to contact Mr. Borisov.  No

13  questioning of Mr. Borisov was done at the traffic stop

14  three months later, if he happened to be in the system.  I have

15  no idea.  They made no effort to contact him.

16      And the most important piece is -- and it was left out by

17  Ms. Grier.  I recognized it the other day after I filed my

18  motion.  And that is that the alleged victim stated in the

19  report that they had no desire to pursue any action against who

20  they were talking about.  And I think that speaks volumes,

21  mainly because it makes suspect what they initially reported to

22  the officer who then took that information and tried to connect

23  it to Mr. Borisov.

24      So there was no opportunity, if this was such --

25      **THE COURT:**  I don't know.  That seems pretty speculative

1  to say that that is what we should conclude from the victim's

2  statement that they don't want to press charges.

3      **MR. BUSTAMANTE:**  Yeah.  There's a number of inferences

4  that one can make, but that's definitely one of them.

5      But the more important piece for me is, even if a victim

6  says that -- and the Court has been around a while and so have

7  I -- we know that the desires of a particular victim to pursue

8  a prosecution or not has very little weight because, you know,

9  all of the complaints and indictments say "the United States

10  Government" or "the People of the State of California."  That's

11  who prosecutors represent, not just the victims.

12      So if it was such an egregious attack and they had such

13  great information about Mr. Borisov being the person connected

14  to the event, no report was forwarded to a district attorney's

15  office where it lands on a rebooking D.A.'s desk, where he

16  makes a determination whether that's going to get filed.

17      **THE COURT:**  How do you know that?

18      **MR. BUSTAMANTE:**  Well, the reason I know that is because

19  it's not in any of the reports; that all we have is a

20  preliminary investigation report.  There's nothing in the

21  report -- there's so many things that are missing from the

22  report to suggest that it was forwarded.  My client was never

23  charged.  It wasn't declined.  None of that information was in

24  the report.  And the Court makes a good observation, that it's

25  three months later and it's a type of car.

1      So I totally understand that information, subject to some

2  guidelines, should and can be included for the reasons that

3  the Court can use it for who my client is and for the BOP.  But

4  the verbiage that Ms. Grier -- who I have a lot of respect for

5  but we agreed to disagree on this particular subject -- says in

6  the probation officer's response on page 27, on the addendum,

7  that (as read):

8          "The information must be relevant and

9      persuasively established on the basis of reliable

10     information."

11     So all I'm suggesting to the Court is that the information

12 that the Court, I think, tagged correctly at the beginning,

13 it's rather vague.  And so I don't think that it necessarily

14 rises to the level of being persuasively established as

15 reliable information.

16     **THE COURT:**  Okay.  Anything -- Ms. Grier, anything else

17 you want to say about that?

18     **MS. GRIER:**  No, Your Honor.  And I absolutely can strike

19 it if that's the Court's determination.

20     **THE COURT:**  I'm going to order that paragraph stricken.

21     And other than those two things, the guideline calculation

22 and this paragraph, I can go ahead and adopt the Presentence

23 Report; correct?

24     **MS. GRIER:**  Yes.  But to be clear, I will amend the

25 report, since this is going to the BOP, to remove that

 1   paragraph.  After sentencing, I will take care of that.

 2          **THE COURT:**  Okay.  Great.

 3          **MR. BUSTAMANTE:**  Thank you, Your Honor.

 4          **THE COURT:**  So that leaves us -- that leaves us with,

 5   you know, the decision about what the appropriate sentence

 6   should be for Mr. Borisov, considering all of the 3553(a)

 7   factors.  And I'll hear from the Government on that.

 8          **MS. LIU:**  Yes, Your Honor.  Thank you.

 9          In the Government's view -- so our position is mostly

10   what's set forth in the sentencing memorandum, but the

11   highlights are that this was a conspiracy between three

12   co-defendants to conspire to kidnap and to rob a victim of

13   millions of dollars of drug proceeds.  Each person played a

14   different role, or at least in the planning stages, suggested

15   that they played a different role.

16          Mr. Borisov's role was to be the enforcer and to do, in

17   his words, the hard part.  Based on the evidence, the evidence

18   does suggest that that meant Mr. Borisov was going to fly over

19   from Chicago to California; and he was going to be picked up at

20   the airport by Mr. Kopankov; and he was going to go over to the

21   victim's residence, which he relied upon Mr. Kopankov to

22   provide, and, with Mr. Brooks, to forcibly take the victim

23   against his will, hold him in another location until they gave

24   up the location of the drug proceeds, and then go ahead and rob

25   the victim of that money.

1          I think from the PSR, the Court can see that the

2     conspiracy was maybe not the most thought-out.  There were

3     certain details that were not cemented, such as whether

4     Mr. Kopankov was going to bring guns or not, whether

5     Mr. Kopankov was going to show up at the actual victim's

6     residence to help with conducting the robbery part or something

7     else.  And the plans did seem like they progressed in different

8     directions during the planning process.

9          But at the end of the day, Mr. Borisov did willingly and

10    knowingly join a conspiracy to use violence against another

11    victim for drug proceeds.  And at the end of the day, he did

12    fly over with the intention of doing so, with the Walmart --

13         **THE COURT:**  Ms. Liu, if I could ask you maybe to slow down

14    a little bit.  I'm worried about the interpreter being able to

15    pick up everything you're saying.

16         **MS. LIU:**  Sure.  I apologize.

17         At the end of the day, Mr. Borisov did go to Walmart to

18    pick out black boots, a black backpack, and other items for the

19    plan.  He did get on a plane.  He did fly over.  And the

20    evidence suggests he was going to carry out the plan with his

21    co-conspirators but for law enforcement involvement.

22         **THE COURT:**  Could I ask you a question about that?

23         You know, at least according to Ms. Grier and, I guess,

24    probably according to the defendants as well, there is

25    significant doubt about whether the ultimate crime would have

been committed; that, yes, they conspired to do it and they committed the crime of conspiracy to do these things but there's significant doubt about whether they would have gone through with it or whether they would have been capable of going through with it.

Is that an appropriate thing for me to consider?  I mean, I'm trying to think of the different reasons one might vary downward from the guideline range.  And it seems like that's the primary reason that's been given perhaps.  And I'm wondering if you have a position on whether that is an appropriate thing to consider in deciding whether to vary downward.

**MS. LIU:**  I think the Court can certainly consider it if you deem it relevant to whether a departure is warranted. I think, however, that the guidelines already account for the fact that the conspiracy was not able to be completed with the minus 3.

And I also don't -- given the severity of the conduct that they were trying to commit, I don't think the defendant should be in some way rewarded for being -- I don't want to say a shoddy planner, but not having thought out all the steps through before --

**THE COURT:**  But you can -- can you get the -- you can get the minus 3 -- I mean, let me make sure I understand the minus 3.

1          What it says in the Presentence Report is that (as read):

2              ". . . a three-level reduction is warranted

3          because the defendants were about to complete all of

4          the acts of the offense, but they were apprehended by

5          law enforcement."

6          So does that -- I mean, just reading that paragraph, that

7     doesn't seem to take into account, you know, what the

8     likelihood -- I mean, if somebody is conspiring to commit a

9     crime and we are very confident that but for the intervention

10    of law enforcement, they would have completed the crime, does

11    that preclude them from getting the three-level reduction?

12         **MS. LIU:**  No.  I think Your Honor's interpretation of

13    2X1.1 is correct.

14         In Mr. Borisov's mind, as I read the evidence, when he

15    arrived at the airport, Mr. Kopankov was going to arrive with

16    guns and was going to show them where the residences were.  So

17    in Mr. Borisov's mind, it's not like he had left off critical

18    steps to withdraw or anything.  I think the unlikelihood of it

19    being completed could be considered, but not too heavily, given

20    that he took all the steps on his end to make sure that the

21    conspiracies could go through.

22         **THE COURT:**  Okay.  And with respect to the gun issue,

23    perhaps it's more relevant to Mr. Kopankov, but it's also

24    relevant to Mr. Borisov for the reason that you just stated --

25    right? -- in terms of what was going on in Mr. Borisov's mind.

1       What is the evidence that in the co-conspirators' minds

2   there was going to be a gun involved?  Is that on a recording,

3   or is that just -- is the evidence from somewhere else?

4       **MS. LIU:**  I thought it was on a recording, but let me

5   check the PSR, which is well-written, to make sure.

6       **MS. GRIER:**  Just if I could jump in.  I'm not sure the PSR

7   indicates -- and I tried to go back through my notes -- whether

8   it was on a recording or whether it was the undercover person

9   who said this is what was said.  I couldn't tell from my notes

10  where that came from.

11      **THE COURT:**  That's what Mr. Michael says in his

12  memorandum -- right? -- is that the informant said that that's

13  what Mr. Borisov said but that it wasn't -- or at least

14  according to the Government, the informant said that that's

15  what Mr. Borisov said, but that was not in a recording.

16  I believe that's what Mr. Michael said in his memorandum.

17      Is that right, Mr. Michael?

18      **MR. MICHAEL:**  That's correct, Your Honor.  And I think

19  what gives that more weight in his absence is the fact that

20  this informant, whose name is Ekoh, he was working with

21  the Government but trying to pay off some of his other debts to

22  the Government and his other problems.

23      But they set this whole thing up so that every single

24  communication that the informant had with Mr. Borisov or

25  Mr. Kopankov or Mr. Brooks, every single conversation was

1   recorded.  The Government set it up.  He had a recording

2   device.  And every single meeting he had -- I think even

3   telephonic or in person -- with Mr. Borisov or Mr. Brooks,

4   although he never, ever spoke to Mr. Kopankov, they're all

5   recorded.

6        And so to me, just addressing that one issue on behalf of

7   both defendants, is that if it's not in a recording, it's

8   really a weak argument to make that the informant, Ekoh, made

9   some offhanded statement that he heard somebody say that, where

10  that hearing of somebody saying that is not in any recorded

11  conversation and he is being controlled by the Government to

12  record everything that was done.  So I think that really

13  weakens whether or not that even existed, that conversation

14  even existed.

15       And I think the Court should be free to give very, very

16  little weight to that because it's not on any recorded

17  conversation.  It's just a throw-in by the informant.

18       **MR. BUSTAMANTE:**  And, Your Honor, I'll just add an

19  observation that I think is not contested.

20       It is true that the Government, in their sentencing

21  memorandum, refers to him as Individual 1.  In the report and

22  in the Presentence Report and all the discovery, it's CH- --

23  cooperating -- CHS, cooperating human source, who we know who

24  it is.  He's probably one of the most prolific cooperating

25  human sources to the Government that I've ever witnessed in

1  34 years of practicing.

2      And if the Court may recall, in the discovery battle that

3  we had early on, there were significant conversations about the

4  fact that post this indictment, but pre us doing the plea, he

5  was indicted in a multimillion-dollar civil scam against the

6  biggest trucking company in the country.

7      **THE COURT:**  Yes, I remember that.

8      **MR. BUSTAMANTE:**  So, and then the other thing more

9  specific to my client, it's also uncontested that CHS -- my

10  client didn't have, to put it crudely, a pot to piss in at the

11  time.  His existence at the time was fueled by alcohol and

12  cocaine addiction, and both the alcohol and cocaine was

13  provided, on numbers of occasions during the course of these

14  meetings, to Mr. Borisov.

15      So even if these discussions are going on, it's being

16  encouraged because they're all being recorded.  He's trying to

17  get as much as he can because he's getting paid hundreds of

18  thousands of dollars to get this information.

19      And the Court's on the right track in terms of what I've

20  struggled with this case since day one.  And, quite frankly,

21  I've never had a case charged as a conspiracy without the

22  substantive act actually being accomplished.  Having gotten,

23  you know, thousands of drug cases, it's just that unusual deal.

24      And so the conversations that I always had with

25  the Government --

1      **THE COURT:**  It's an unusual conspiracy, though.

2      **MR. BUSTAMANTE:**  Yes.  Yes.  Well, not an unusual

3  conspiracy, but just the way it all played out:  the players,

4  the lack of sophistication, the fact that the CHS had to buy

5  them -- took them -- walked them to Walmart and buy dark

6  clothing and a backpack.

7      **THE COURT:**  Well, can I ask you, Mr. Bustamante, what's

8  your client's position on whether the conspiracy included the

9  anticipated use of a gun?

10     **MR. BUSTAMANTE:**  Well, I believe that, you know -- and I

11 can't recall off the top of my head, but I know that the CHS

12 said that those conversations went on.

13     But I can tell you pretty candidly and without hesitation

14 what I've said about this case from the very beginning, to the

15 magistrate, to the judge that heard the detention hearing, to

16 the Government, to Ms. Grier, and possibly in a discovery

17 battle to this Court:  This was a ridiculous plan, at least

18 with regards to Mr. Borisov.  He was living in la-la land,

19 fueled by a fog of cocaine every day for five years, and

20 alcohol.

21     And so, yes, he is guilty of engaging and being solicited

22 for this ridiculous plan and agreed to do it and took some

23 steps in furtherance.  But there really is a question, in my

24 mind, from everything that I've heard in spending three years

25 with my client, who is probably one of -- if all my clients

1   could be like Mr. Borisov for the last three years, I'd be a

2   happy criminal defense lawyer -- the likelihood of it actually

3   happening, in my view, not very likely and probably more of a

4   partying scene and going on to see what's going on with the

5   co-defendants' legitimate or illegitimate pot grows that were

6   there, that was eradicated by the government afterwards.

7          And I think the Court's on the right track with regards to

8   there's both sides of this coin.

9          Now, the Government --

10         **THE COURT:**  But hold on a second.

11         **MR. BUSTAMANTE:**  Sure.

12         **THE COURT:**  I mean, I think you are starting to be guilty

13  of the conduct of your co-counsel, Mr. Michael, in his

14  memorandum in terms of --

15         **MR. BUSTAMANTE:**  I don't want to be guilty of anything.

16         **THE COURT:**  -- minimizing the conduct.

17         **MR. BUSTAMANTE:**  Oh.  So --

18         **THE COURT:**  I mean, let's go back and look at paragraph 2

19  of the plea agreement and see what your client admitted to

20  doing.

21         I mean, are you suggesting that your client didn't do what

22  he admitted to doing --

23         **MR. BUSTAMANTE:**  No.

24         **THE COURT:**  -- in the plea agreement?

25         **MR. BUSTAMANTE:**  No, Your Honor.  And what I was going

1    to -- what I was going to continue with at the tail end --

2    because the one thing I don't want the Court to ever assume --

3    my client is guilty.  My client is going to take whatever

4    lumps.  He understands the consequence of this agreement and

5    taking steps --

6       THE COURT:  What was your comment about maybe this was

7    more partying and relating to the marijuana operation or

8    something?  I just didn't understand --

9       MR. BUSTAMANTE:  Sure.

10      THE COURT:  -- that.

11      I'm looking at paragraph 2, and he's saying he agreed with

12   his co-conspirators to kidnap and rob this person with the use

13   of violence or the threat of violence and hold them until they

14   disclosed where the $3 million was going to be.

15      MR. BUSTAMANTE:  Yeah.  So I don't want, in any shape or

16   form, to adopt the position that the Court is suggesting, nor

17   did I in my sentencing memorandum.

18      The problem with this case is it's a little bit of both.

19   There's no question they conspired and agreed to do, and I'm

20   not going to diminish the type of activity that they discussed

21   and took steps -- took steps --

22      THE COURT:  Okay.  And I was going to ask -- my original

23   question was:  What is you and your client's position on

24   whether the conspiracy included use of a gun?

25      MR. BUSTAMANTE:  It was not going to include use of a gun.

And that's supported by not only not the use of a gun, but there were no maps, no guns, no weapons, no tape, no any of the other things that the CHS claimed was going to be utilized.

So the only thing I'm suggesting, Your Honor, is if those things were found, the other side of the coin that we're discussing is the Government would then be arguing for an enhanced amount of a consequence within that guideline range.

And I am not -- and trust me, there is no doubt.  And I want to highlight the amount of remorse and responsibility that my client takes for this ridiculous scheme and how serious it is and the activity and the plan and plot.

But the other side of that coin is for the Court to consider, okay -- and Ms. Grier did a fabulous job in just sort of showing the Court in that one paragraph in the addendum there's sort of two sides to this point, Your Honor.  And, yes, nobody -- and I am never going to suggest and I'm not asking that my client get, you know, a pass.  He's going to do some time.  The question is:  How much time does this human being do, how much time does this human being expect to do based on the context of all the things that the Court is highlighting right now?

And I told my client, look -- there was a lot of anxiety yesterday.  I said:  Listen, Boris, your letter that you wrote, I didn't clean it up.  I didn't make corrections for your English.  That's your letter.  That's you telling the Court how

1    you feel about it.  I know you've got anxiety about what's

2    going to happen, but I want you to understand that this Court's

3    job is to make a determination about what kind of human being

4    you were then, what kind of human being are you now, and what

5    does he think about what you're going to do in the future,

6    because all of those things are linked and there's a common

7    thread between those three.  And I told him all I can do is

8    give my best shot.

9        But when I say that Boris has been an extraordinary client

10   for me, his rehabilitation post-indictment has been remarkable;

11   and that's because underlying, you know, this fog and crazy

12   lifestyle that he lived back when this ridiculous thing was put

13   together, he's been clean and sober for three years.  He works

14   out like a maniac, which is why he's as big as he is.  He was

15   dreaming to get his trucker's license.

16       The common thread through all of the letters in support of

17   this man is that he really is this gentle giant.  The letter by

18   his best friend in Florida, who he's visited numerous times,

19   who's got these beautiful young kids that love their godfather,

20   Boris, is amazing.  The place outside of Illinois where they

21   raise dogs, there's this huge community where they raise these

22   monster dogs that are, I guess, half wolves or something, but

23   he's this breath of fresh air.  He cooks for them.  He cooks

24   for his wife's family.  I didn't know he was such a good cook.

25       So he's going to take a hit.  We're not diminishing it.

1    We're not asking for something ridiculous.  The question really

2    is:  How far do you go, based on the things that the Court

3    brought to light?

4         **THE COURT:**  Okay.  Let me go back briefly to Ms. Liu, just

5    because I think I interrupted her a while back.

6         **MR. BUSTAMANTE:**  Sorry.

7         **THE COURT:**  So in terms of identifying, you know,

8    potential reasons to vary downward, one of them we've discussed

9    at length is sort of the likelihood that this wasn't going to

10   happen because of the lack of sophistication of the

11   participants in the conspiracy.

12        You know, another reason that they've identified is

13   community, family support and, relatedly, the likelihood of

14   being deported and taken away from that community and family

15   support.  Performance on pretrial release for a lengthy period

16   of time was another thing that was mentioned.  I think that

17   probably covers it.

18        Do you want to respond to any of those other points

19   briefly?

20        **MS. LIU:**  Not to the points that you identified.

21        I know Mr. Bustamante brought up a whole series of topics.

22   I don't know which -- if you'd like a response to any of them.

23        But in general, I apologize for not being able to remember

24   whether Mr. Borisov's statement about the firearms was recorded

25   or not or if the CI's recollection is all we have.  I don't

know that off the top of my head.

But from paragraph 2 of the plea agreement, the defendants did agree that they were planning to use force, that Mr. Borisov and Mr. Brooks were planning to use force enough to threaten the victim to reveal $3 million -- the location of $3 million.

The evidence is not clear whether that was going to be through a firearm or through physical brute force or something else, but the evidence does show that at the time of arrest, there were no firearms recovered.

One interpretation is that firearms were never meant to be used. Another interpretation is that Mr. Kopankov was going to pick them up; and on the way to the victim's house or elsewhere, to get a rental car for them or elsewhere, they were going to pick up more items.

**THE COURT:** Okay. All right. Mr. Bustamante, before I turn to Mr. Borisov, is there anything else that you want to say?

**MR. BUSTAMANTE:** I'd like to turn it over to Mr. Borisov, but I wanted to just say two things.

Another thing that's going to affect Mr. Borisov -- and I'm glad that the Court took note of the fact that he's going to -- he's been here since he was 18; he's going to be deported to a country he hasn't been at.

But when he goes to the BOP, purportedly there's a lot

1    of -- because of the Fresh Start -- I think it's called Fresh

2    Start -- all the opportunities that now exist and there's

3    opportunities that previously existed like RDAP, or 500 hour --

4    and you can get up to a year off.  Because he's not a citizen,

5    it's my understanding -- and this is not going to --

6    Mr. Borisov is going to take all the opportunities he can to

7    better himself while he's in there.  But the other side of that

8    coin also is he's not going to get any of the benefits for

9    reduction of time because he's not a citizen of the

10   United States.  And I'm just suggesting to the Court that that

11   might be just another thing that the Court might consider.

12        There was the performance, deported...

13        The final thing I'll say, Your Honor, is Boris is a

14   different human being than he was back then, and it's been a

15   remarkable transformation from the first day I met him in

16   custody.  His anxiety has settled down.  He has a plan for his

17   future.  He's one of those lucky ones that has a wonderful

18   significant other.  And the support and love that he has and

19   that he shares with all the people that wrote, I think, it was

20   18 letters, it's pretty extraordinary, in my view.  And my

21   interaction with him, my staff, my two law clerks, everybody

22   loves this guy because he is really a gentle guy.

23        But he has a price to pay.  He's not making any excuses

24   for what he did.  The cocaine and alcohol was part of an

25   explanation.  He understands he's going to take a hit.

1      And I'll let you -- I'll let him explain to the Court, if

2   you give him a moment, how he feels about it.

3      **THE COURT:**  Okay.  Mr. Borisov, you have the right to

4   speak at your sentencing hearing.  It's not a requirement, but

5   I'm very happy to hear anything that you would like to say if

6   you want to go ahead.

7      **DEFENDANT BORISOV:**  Thank you, Your Honor.  Yeah, I would

8   like to say something.

9      First of all, I would like to say I'm extremely sorry for

10  what happened three years ago, and I take responsibility of my

11  action.

12      And second, I would like to say that my life moving

13  forward has been completely different.  I'm sober and I'm clean

14  for three years.  I never miss a day of work.  And that's my

15  plan for the future.

16      I cannot change what happened, but I can only change my

17  future.  And these three years changed me a lot.  I have an

18  amazing girl next to me.  She supports me.  Her family supports

19  me.  And I think that's the best that came out of the whole

20  thing; because, yes, everything has been terrible, but it did

21  change me as a human being.

22      So that's why I'm hopeful -- I'm thankful, I mean.  I'm

23  thankful for my family; I'm thankful for my sister; I'm

24  thankful for my girlfriend; and obviously, I'm thankful for

25  everything that's been happening.  I did change a lot.

1    My life's been completely mess before that.  I was on

2  drugs for probably five years of my life.  I did take bad

3  decisions.  And I cannot change any of that.  But I'm sorry for

4  it, and I can only change my future.

5    And whatever decision you make, Your Honor, I will accept

6  it.  Like I said, I take full responsibility of my actions.

7    Thank you.

8    **THE COURT:**  Okay.  Thank you, Mr. Borisov.

9    And as I said, I'll make a final decision as to both

10  defendants after going through the same process for

11  Mr. Kopankov.

12    So let's begin now with Mr. Kopankov.  I know there are a

13  number of objections to the Presentence Report.  We can get to

14  those in a second.

15    With respect to the guideline calculation, same thing as

16  Mr. Borisov.  Right?  I will adopt the guideline calculation

17  proposed by the parties.

18    **MR. MICHAEL:**  We do have a suggestion to the Court

19  regarding the guideline calculations in our Presentence Report,

20  which I'd like to address at the appropriate time with

21  the Court, Your Honor.

22    **THE COURT:**  Okay.  If you want to address -- okay.  Was

23  there something different from what Mr. Borisov is suggesting?

24    **MR. MICHAEL:**  Yes.

25    **THE COURT:**  Okay.  Sorry.  I must have missed that.

1        Go ahead.

2        **MR. MICHAEL:**  Do you want to talk about that now or get

3    into some of the other objections?

4        **THE COURT:**  Go ahead.  Let's get the guideline calculation

5    out of the way.

6        **MR. MICHAEL:**  Okay.  What -- and this is a combined

7    robbery-kidnapping guideline calculation which starts at

8    Level 24, appropriate offense level.  And with the assistance

9    of my sentencing specialist, Tess Lopez, we went through all of

10   that really in great deal.

11       And we believe that this Court can and should think of Mr.

12   Evgeni's involvement in this case not as a robbery-kidnapping,

13   but only as robbery, because -- I could go back to the

14   beginning.  And some of the arguments that I wanted to make to

15   the Court is that there's no evidence that Evgeni Kopankov was

16   going to ever participate in this going to the property and

17   grabbing the victim and kidnapping him until he disclosed where

18   this money was.

19       And I have a bit of a -- and even though we've had great,

20   great discussions with Ms. Grier and she's been very open; and

21   my client and Maria, his wife, have had numerous discussions

22   with her; so has Tess Lopez, our sentencing specialist --

23       **THE COURT:**  Make sure you -- can you slow down a little

24   bit to make sure that the interpreter can pick up everything

25   that you say?

1          **MR. MICHAEL:**  Thank you, Your Honor.  Yeah, I do have that

2     rushed voice.

3          First of all, the objection we have, one of the serious

4     objections to Ms. Grier's report is the inference that's

5     created in her report that Evgeni was going to also go to the

6     location where this alleged victim was.  And that's not true.

7          And I had numerous conversations with Ms. Liu about how

8     Evgeni's plea agreement was going to read, because the fact of

9     the matter is, is that the only --

10         **THE COURT:**  So can I interrupt you for a second?

11         **MR. MICHAEL:**  Sure.

12         **THE COURT:**  I'm presuming from the -- I'm willing to

13    presume from the plea agreement and from everything that's been

14    discussed that Mr. Kopankov was not planning on being at the --

15    waiting with Mr. Borisov and Mr. Brooks, but -- so -- but we

16    can circle back to that in a second.

17         I'm just asking about the guideline calculation now.

18         **MR. MICHAEL:**  Well --

19         **THE COURT:**  And what you said about the guideline

20    calculation, if I heard you correctly, is that I should be

21    thinking about this not as a conspiracy to kidnap and to commit

22    robbery, but just as a conspiracy to commit robbery.  Did I

23    hear that correctly?

24         **MR. MICHAEL:**  Well, I don't know about the conspiracy

25    part; but we feel that instead of it being a Level 24 guideline

1   for robbery and kidnapping, which is the combined offenses, is

2   that we feel it may be more appropriate for him, is

3   Mr. Kopankov -- and this Court has the discretion to do this --

4   should start with a base offense level of 20, which is only the

5   guideline that's analogous to robbery and which is 2B3.1.  I

6   think that's in --

7       **THE COURT:**  Can I ask a question about that?

8       **MR. MICHAEL:**  Sure.

9       **THE COURT:**  Are you, like, making a motion on behalf of

10  your client to withdraw the guilty plea?  Because your client

11  pled guilty to both crimes, Count One and Count Two.

12      Count One --

13      **MR. MICHAEL:**  No.

14      **THE COURT:**  -- is conspiracy to commit kidnapping, and

15  Count Two -- sorry.

16      Count One is conspiracy to commit robbery, and Count Two

17  is conspiracy to commit kidnapping.

18      So I'm getting -- I will tell you, Mr. Michael, that I

19  was -- when I read your sentencing memorandum, I was very

20  confused because it seemed like you were -- it seemed like you

21  were attempting to retract your client's admissions in the plea

22  agreement.  And now --

23      **MR. MICHAEL:**  No.

24      **THE COURT:**  Now here, at the sentencing hearing, you seem

25  to be saying that the guideline calculation is wrong because,

1  you know, he wasn't involved in a conspiracy to commit

2  kidnapping, even though he pled guilty to conspiracy to commit

3  kidnapping.

4       So what the heck is going on?

5       **MR. MICHAEL:**  No.  I'm just saying that you, Your Honor,

6  have the power to take that into consideration and that you

7  have the power to deviate from that guideline analysis and you

8  have the power to say that what is more appropriate for him,

9  considering all the facts in this case, that he certainly

10  wasn't going to go there to do any of those acts and his only

11  role -- and that's in his plea agreement -- his only role was

12  to identify the person that they were going to --

13       **THE COURT:**  Okay.  So the way sentencing works now is we

14  figure out what the guideline calculation is.  We figure out

15  what the guideline range is, and then we treat that as advisory

16  and we go on to ask whether there should -- applying all of the

17  3553(a) factors, whether there should be a variance from the

18  guideline range.

19       The first question I'm asking you is what the advisory

20  guideline calculation should be.  And I thought that you and

21  the Government were in agreement that the advisory guideline

22  calculation, the total offense level was 24 and the guideline

23  range that I should adopt coming out of that is 51 to

24  63 months.

25       Are you now saying -- did I misunderstand that?  Are you

1   now saying something different, that you're objecting to that

2   guideline calculation?

3        **MR. MICHAEL:**  No, we're not objecting to it.  We're

4   just --

5        **THE COURT:**  Okay.  So I can adopt that guideline

6   calculation and then go on to consider whether to vary downward

7   from it based on all of the 3553(a) factors?

8        **MR. MICHAEL:**  That's exactly right, Your Honor.  That is

9   what we --

10       **THE COURT:**  Okay.  So I will go ahead and adopt that

11  guideline calculation, then.

12       And I know you have other objections to various paragraphs

13  in the Presentence Report; but before we get to the specific

14  objections you have to various paragraphs in the Presentence

15  Report, I just need to tell you that, from reading your

16  sentencing memorandum, it sounded like you were essentially

17  retracting your -- attempting to retract your client's

18  confession to the two crimes that he pled guilty to and really,

19  at a minimum, dramatically minimizing his involvement to the

20  point where, if one were to believe everything that you wrote

21  in your sentencing memorandum, one would have to seriously

22  question whether your client committed a crime.

23       And so if your client, in fact, did commit the crime and

24  if your client persists in his admission that he committed both

25  of these crimes, as stated in the plea agreement, your approach

1  in your sentencing memorandum is counterproductive, not

2  helpful.  Right?  It doesn't help me in determining what his

3  sentence should be because, when you come in at sentencing and

4  the thrust of your argument is "My client isn't actually really

5  guilty," that's not helpful.

6      And that seemed to be the thrust of your argument in your

7  memorandum and the thrust of some of your objections to various

8  paragraphs in the Presentence Report.

9      So my first question for you is:  Is your client guilty of

10  the two crimes that he pled guilty to?

11      **MR. MICHAEL:**  Yes, Your Honor.  And our sentencing

12  memorandum was not trying to avoid that.  Our sentencing

13  memorandum --

14      **THE COURT:**  Okay.  Now I'm going to pause for a second,

15  and I want to ask Mr. Kopankov a question or maybe a couple of

16  questions.

17      Mr. Kopankov, with the interpreter and everything, were

18  you able to follow the discussion that I just had with your

19  lawyer?

20      **DEFENDANT KOPANKOV:**  Yes.  More or less, yes.

21      **THE COURT:**  Okay.  More or less?  Are you concerned that

22  maybe you did not follow some of it?

23      **DEFENDANT KOPANKOV:**  I understood most of it.

24      **THE COURT:**  Okay.  Well, let me restate the conversation

25  that I had with your lawyer to make sure that you fully

1    understand it.  Okay?  Let me summarize it.

2        I told your lawyer that I was confused by the brief that

3    he filed, the sentencing memorandum that he filed, because it

4    almost seems like your lawyer is arguing that you're not

5    guilty.  And you pled guilty to these two crimes.  I am pulling

6    up the plea agreement again.  You pled guilty to Count One,

7    which is conspiracy to commit robbery; and you pled guilty to

8    Count Two, which is conspiracy to commit kidnapping.

9        And so after reading your lawyer's brief that he filed, I

10   need to ask you:  Is it still your position that you are guilty

11   of those two crimes?

12       **DEFENDANT KOPANKOV:**  Yes, I am guilty.  But can I explain?

13       **THE COURT:**  Sure.

14       **DEFENDANT KOPANKOV:**  I will try to -- I will try to

15   explain what my attorney is trying to say in this memorandum.

16       That I am guilty and I am accepting all the

17   responsibility, but I was not present during most of

18   conversations and I did not -- was not part of the

19   conversations that were said about this crime.  Just, they

20   don't -- I was involved throughout my presence, actually.  So

21   that's what I wanted to say.

22       **THE COURT:**  I'm sorry.  I did not understand the very last

23   part about the presence.  It might have been an interpreter

24   issue, or it might have just been that you need to restate it.

25   But can you say that last part again?

1    **DEFENDANT KOPANKOV:**  I just wanted to say that I was not

2    present during all these conversations that they happened with

3    the informant and that I -- and I didn't know about those

4    things.  I did not agree to those things.  Only when the case

5    started, I learned about these things.  And before that, I

6    never -- I've never known about those things.  I never heard of

7    them.

8         And I think in this document, my attorney is trying to

9    explain very well -- explain well what I understand and what I

10   don't understand.

11        But in principle, yes, I admit my guilt in both counts.

12        **THE COURT:**  Well, I mean, I'm still confused because,

13   you know, the statement "I did not know about these things,"

14   I --

15        **MR. MICHAEL:**  May I offer an explanation of that,

16   Your Honor?

17        **THE COURT:**  I don't know.  I think I need to hear it from

18   your client, frankly.

19        When you say something like "I didn't know about these

20   things," it makes me concerned that you are trying to say that

21   you didn't know about the plan to rob the victim and you didn't

22   know about the plan to kidnap the victim.  So I'm a little

23   confused at this point.

24        What things did you not know about?

25        **DEFENDANT KOPANKOV:**  I did not know that this -- I did not

1  know about the plan in all the details.  I just knew about --

2       **THE INTERPRETER:**  Hold on.  Hold on.

3       **DEFENDANT KOPANKOV:**  I knew about the taking of the money,

4  but I agreed to -- I agreed to just show them the place, and I

5  didn't even know that they would actually take the money and

6  rob him, because we had some other conversations where we were

7  talking with Mr. Borisov that he would come and he would just

8  do actual work.  And we only talked about the robbery that

9  once, and that was it.

10      **THE COURT:**  Okay.  Mr. Michael, was there something you

11  wanted to say?

12      **MR. MICHAEL:**  There was, Your Honor.

13      The point that I was trying to make, in agreement with

14  what Mr. Kopankov just said, was that (a) he was not on any or

15  all of these recorded conversations with the informant, with

16  Mr. Borisov.

17      There's one recorded conversation between Evgeni and

18  Mr. Borisov and it was a neutral conversation about he was

19  going to meet them.  They were flying in, and he was driving

20  over and he was going to meet them at the airport.

21      **THE COURT:**  When you say "it was a neutral conversation,"

22  what do you mean by that?

23      **MR. MICHAEL:**  It wasn't a discussion of any criminal

24  conduct at all.  It was just a discussion that he was going to

25  meet them.

 1          And that was part of what Evgeni was explaining to

 2     the Court just now, that there was also discussions between

 3     Evgeni and Mr. Borisov regarding working in the cannabis

 4     industry also.

 5          As the Court knows, Evgeni had -- not only did he have his

 6     trucking business in Chicago, he was also licensed by Humboldt

 7     County and by the California Department of Agriculture to have

 8     a cannabis grow operation in Northern California.  And he had

 9     one there.  He owned a piece of property there, and it was a

10     lawful, licensed cannabis grow operation.

11          All this stuff was all disclosed in our detention hearings

12     with Judge Beeler.  She knew well about it.  And he actually

13     posted that property as a security for his release.

14          So his life was a lot more complex.  He had a licensed

15     trucking business that was doing very well in Chicago.  It was

16     an incorporation.  He had a grow operation in California, in

17     Northern California, that was licensed both by the County of

18     Humboldt and by the California Department of Agriculture.  And

19     he had other reasons why he was coming to California to meet

20     them.  And that's why it's somewhat complicated.

21          And maybe the Court is somewhat confused about all that

22     because he had legitimate reasons to come to California.  For

23     crying out loud, he was driving a truck pulling a trailer full

24     of furniture for his grow operation in California, his legal

25     grow operation in California.

1    And so our objections in the -- to the report by Ms. Grier

2    was whether or not his role was only to tell them the location

3    of the person that they wanted to rob.  That's all his role

4    was.  And that was agreed with everybody that that's all his

5    role was.  It's in the record that that's all his role was.

6    I mean, it's in the record in the conversations between

7    Mr. Borisov and the informant Ekoh, where they completely say

8    that Evgeni is not going to the property; he's not going there;

9    all he's doing is identifying the property.  There's two

10   conversations between the informant and Mr. Borisov -- that's

11   in our sentencing memorandum -- where he's only going to

12   provide the location and he's not going to the location.

13   And also, there's the testimony before the grand jury of

14   FBI Special Agent Rachel Hamilton where she testified under

15   oath before the federal grand jury that he was only going to

16   provide the location of the property.

17   So that's where it gets touchy and where we are raising

18   some of the objections to the PSR, especially the objection

19   where it may be inferred with Ms. Grier's PSR that he was going

20   to participate in that.

21   So even though he's pled to both counts, his role, his

22   role was only to give them the location of where this

23   particular grower was.  And actually, the evidence in this case

24   is that nobody even knew, at the time of their arrest, where

25   this location was and where this guy's property was.  It was

 1   all just a bunch of hyperbole and dialogue and suggestions and

 2   all this stuff between --

 3         **THE COURT:**  Well, I mean, your description --

 4         **MR. MICHAEL:**  -- the informant --

 5         **THE COURT:**  The description you just gave is, at a

 6   minimum, in significant tension with paragraph 2 of the plea

 7   agreement that your client and you signed.

 8         **MR. MICHAEL:**  Well, he did enter into a conspiracy to

 9   commit --

10         **THE COURT:**  What paragraph 2 says is:

11               Beginning at least in March 2019 and on to

12         April 3rd, I knowingly and intentionally conspired

13         with Borisov and Brooks to commit robbery affecting

14         interstate commerce and to commit kidnapping.  I

15         agreed with my co-conspirators that they would travel

16         from Chicago to the Northern District to kidnap and

17         rob Victim 1.  They planned to wait for him outside

18         his residence.  I showed them the location of his

19         residence in furtherance of the conspiracies.  As

20         soon as Victim 1 was outside of the gate of his

21         property, my co-conspirators planned to forcibly take

22         him to another location, against his will and by

23         means of actual or threatened force or violence,

24         until the victim told them the location of the drug

25         proceeds.  And once he told them the location of the

1        money, they planned to take the money and split it

2        amongst ourselves.

3        "Ourselves."

4        And then it describes your client committing overt acts,

5   including meeting them at the McKinleyville airport to pick

6   them up, in furtherance of this conspiracy to rob somebody and

7   kidnap them.

8        And so, you know, what's going on now is just you're

9   really, really minimizing, it seems to me, your client's

10  conduct to the point where you seem to be arguing that he

11  didn't commit the crime.

12       And I will tell you, that crime that your client admitted

13  to in the plea agreement, you go to jail for that crime.  Okay?

14  You've requested a non-custodial sentence.  You go to jail for

15  that crime.

16       And so I'm not sure what to do with Mr. Kopankov.  I am

17  not going to sentence Mr. Kopankov now.  I am going to continue

18  this sentencing hearing, because I need to think about it more

19  and I have some questions.

20       I mean, let me ask the Government, Ms. Liu, one question.

21       I assume Mr. Borisov would like to put all of this behind

22  him and to complete his sentencing today, and we can do that.

23  And I'm seeing Mr. Borisov nod his head.  We can do that in a

24  second.

25       **MR. BUSTAMANTE:**  Yes.

1          **THE COURT:**  Go ahead, Mr. Bustamante.

2          **MR. BUSTAMANTE:**  Yes, Your Honor.  Our position and our

3     sentencing memorandum is strikingly different and --

4          **THE COURT:**  I understand that.  I understand that.  So --

5          **MR. BUSTAMANTE:**  We want to proceed.  Thank you.

6          **THE COURT:**  Let me ask Ms. Liu.

7          I mean, do you think -- should the defendant -- should

8     Mr. Kopankov be getting a reduction of his guideline

9     calculation for acceptance of responsibility at this point?

10         **MS. LIU:**  Your Honor, I'm frankly a little confused

11    myself.  I think, interpreted in one light, what counsel is

12    saying is that Mr. Borisov had multiple reasons, in

13    Mr. Kopankov's mind, for visiting California.  If that's the

14    case, I don't think that negates Mr. Kopankov's intent to

15    receive Mr. Borisov at the airport, in part to commit this

16    robbery and kidnapping by providing critical information like

17    the victim location.

18         So I'm struggling with that and with Your Honor's

19    questions to Mr. Kopankov, where there seems to be some

20    confusion about what he was -- what he was planning his role to

21    be in the conspiracies and what he knew.

22         **MR. MICHAEL:**  And I will add to that, Your Honor, that in

23    this -- the plea agreement that was ultimately executed by

24    Mr. Kopankov was the result of a number of discussions that I

25    had with Ms. Liu, where I wanted to make it clear, and we did

1  make it clear in that plea agreement, that there's no --

2  there's no admission in that plea agreement that he was going

3  to travel to the property to be part of the kidnapping and the

4  extortion of the money from --

5       **THE COURT:**  I understand that.  But, I mean --

6       **MR. MICHAEL:**  That was --

7       **THE COURT:**  -- the --

8       **MR. MICHAEL:**  That was -- that was negotiated.

9       **THE COURT:**  -- minimization that I'm getting from your

10  memorandum and from you today, and Mr. Kopankov, seems to be

11  going beyond that.

12       I mean, you opened your presentation by telling me that I

13  should not think of this as a conspiracy to commit kidnapping.

14  And your client pled guilty to conspiring to kidnap somebody.

15  So, you know, as I said, I don't know -- I will be honest with

16  you.  I don't quite know how to handle this situation.  I've

17  not had a situation like this before where I saw such

18  minimization by a defense lawyer of their client's conduct

19  after a guilty plea and at the sentencing hearing, and I'm not

20  quite sure how to handle it.

21       And so I'm going to continue Mr. Kopankov's sentencing

22  hearing.

23       **MR. MICHAEL:**  That's fine, Your Honor.

24       **THE COURT:**  And it may be that I seek supplemental

25  sentencing memoranda from the parties.

As for Mr. Borisov, I believe that based on everything that's been presented and applying all of the 3553(a) factors, it would be appropriate to give Mr. Borisov a downward variance from the guideline range.

It is a very serious crime.  And as I said to Mr. Michael, you know, if you commit this crime, you go to jail.  But I think that there are a number of things that support a downward variance for Mr. Borisov, and I mentioned them.  But one is, you know, the significant possibility that it was not going to be carried out; the community and family support and, combined with the community and family support, the fact that he may well be deprived of that after he finishes serving his sentence as a result of being deported; his performance on pretrial release as well.

And so for all of those reasons, I think it would be appropriate to adopt the Probation Office's recommendation of a sentence of 30 months.  And so I will formally hand that down, that sentence down right now.

**MS. LIU:**  Your Honor, and to clarify, you wish to proceed with Mr. Borisov's sentencing while holding Mr. Kopankov in continuance, even though, in the Government's view, they perhaps should be sentenced together?

**THE COURT:**  Yes.  I just need to think more about it.  I mean, the primary thing that I need to think about with Mr. Kopankov, just to make clear, is whether he deserves any

1    credit for acceptance of responsibility and whether, you know,

2    the approach that he's taking to this warrants a higher

3    sentence than he might otherwise get.   That's the primary

4    reason I'm putting this over.

5        **MS. LIU:**  Okay.  Thank you.

6        **THE COURT:**  Okay.  So pursuant to the Sentencing Reform

7    Act of 1984, it's the judgment of the Court that Emanoel

8    Borisov is hereby committed to the custody of the

9    Bureau of Prisons to be imprisoned for a term of 30 months.

10   This term consists of 30 months on each of Counts One and Two,

11   and all counts to be served concurrently.

12       I recommend that the defendant participate in the

13   Bureau of Prisons' Residential Drug Abuse Treatment Program.

14       Upon release from imprisonment, the defendant shall be

15   placed on supervised release for a term of three years.   This

16   term consists of terms of three years on each of Counts One and

17   Two, all such terms to run concurrently.

18       Within 72 hours of release from the custody of the

19   Bureau of Prisons, the defendant shall report in person to the

20   probation office in the district to which the defendant is

21   released.

22       While on supervised release, the defendant shall not

23   commit another federal, state, or local crime; shall comply

24   with the standard conditions that have been adopted by

25   this Court; shall refrain from any unlawful use of a controlled

1    substance and submit to a drug test within 15 days of release

2    on supervised release and two periodic drug tests thereafter;

3    and shall comply with the following special conditions.

4         These, Mr. Borisov, are the special conditions of your

5    supervised release.  And before I read those off, let me just

6    ask Mr. Bustamante.

7         I didn't ask if you had any objections to any of the

8    special conditions of supervised release or the standard ones,

9    I suppose.  And now that you are no longer worried about,

10   you know, making me mad by objecting to those and worried that

11   it might affect the sentence, do you want to -- do you have any

12   objections?

13        **MR. BUSTAMANTE:**  I optimistically believe that I don't

14   plan on making you mad, Your Honor.

15        But I don't have any objections to the standard ones.  And

16   as I'm looking at the -- I don't believe that I have any to the

17   special ones as well.

18        **THE COURT:**  Okay.  I have one objection.  I am not

19   inclined to -- I'm not inclined to impose the expanded search

20   condition.

21        **MR. BUSTAMANTE:**  Oh, that's -- I appreciate your bringing

22   that up, Your Honor.  That's --

23        **THE COURT:**  Well, you have an agreement with

24   the Government that you will ask for it; but regardless of your

25   agreement with the Government to ask for it, I have to conduct

1   my own independent assessment of whether that condition is

2   appropriate, given the crime and the defendant's situation.

3        And I believe that that search condition, that expanded

4   search condition is too onerous; and I believe the standard

5   search condition that our Probation Office uses is more

6   appropriate.  And that requires that Mr. Borisov submit to a

7   search by a probation officer based on reasonable suspicion

8   that the terms of supervised release are being violated or that

9   he's committing a crime.  So I will replace the expanded search

10  condition with that.

11       Okay.  Here are the special conditions of supervised

12  release, Mr. Borisov.

13       Number one, you must pay any special assessment that's

14  imposed by this judgment and that remains unpaid at the

15  commencement of the term of supervised release.

16       Number two, you must undergo an assessment for mental

17  health treatment services.  If services are deemed appropriate,

18  any fees associated with the program are waived.

19       Number three, you must not have any contact with any

20  co-defendant in this case; namely, Evgeni Kopankov and Paul

21  Brooks.

22       Number four, you must cooperate in the collection of DNA

23  as directed by the probation officer.

24       And number five is the search condition, and let me pull

25  up the standard language.  You must submit your person,

residence, vehicle, residence, office, or any other property

under your control to a search.  And that includes computers,

cell phones, and other electronic devices.  Such a search must

be conducted by a U.S. probation officer at a reasonable time

and in a reasonable manner based on reasonable suspicion of

contraband or evidence of a violation of a condition of

release.  Failure to submit to such a search may be grounds for

revocation.  You must warn any residents that the premises may

be subject to searches.

And I do find that the search condition should include

cell phones and other electronic devices.  Given the nature of

this crime for which Mr. Borisov has been convicted and given

the likelihood of communication regarding such crimes on

electronic devices, it's appropriate to include that in the

search condition.

So let me go back now.

**MS. GRIER:**  You're on number six, Your Honor.

**THE COURT:**  Thank you.  Number six, you must participate

in a program of testing and treatment for drug and alcohol

abuse as directed by the probation officer until such time as

you are released from treatment by the probation officer.  And,

again, any fees associated with that are waived.

Number seven, you must abstain from the use of all

alcoholic beverages.

Number eight, you must comply with the rules and

1    regulations of the U.S. Immigration and Customs Enforcement

2    and, if deported, not reenter the United States without the

3    express consent of the secretary of the Department of Homeland

4    Security.

5         Upon reentry into the United States during the period of

6    court-ordered supervision, you must report to the nearest

7    U.S. Probation Office within 72 hours.

8         It's further ordered that the defendant shall pay to the

9    United States a special assessment of $200.  Payment shall be

10   made to the Clerk of the U.S. District Court at the address

11   listed in the judgment.  And during imprisonment, payment of

12   the criminal monetary penalties are due at a rate of not less

13   than $25 per quarter.  And payment shall be through the

14   Bureau of Prisons' Inmate Financial Responsibility Program.

15        I order that the defendant does not have the ability to

16   pay the fine and I order that waived.

17        And the final thing I'll say, Mr. Borisov, is that it's

18   clear, both from reading all the papers and from talking to the

19   probation officer, that you have been doing very well on

20   pretrial release and that you really are making real progress

21   in turning things around for yourself.  And regardless of what

22   happens following your prison term, I wish you the best of luck

23   in continuing that process.

24        **DEFENDANT BORISOV:**  Thanks, Your Honor.

25        **MS. GRIER:**  Can we set a date --

1        **DEFENDANT BORISOV:**  I really appreciate it.

2        **MS. GRIER:**  Can we set a date for surrender, Your Honor?

3        **THE COURT:**  Sure.

4        Kristen, what date should we set?

5        **THE CLERK:**  April 8th.

6        **THE COURT:**  All right.  April 8th will be the surrender

7    date.

8        **MR. BUSTAMANTE:**  And, Your Honor, can I make one request?

9        Mr. Borisov resides in the state of Illinois.  I know that

10   there's -- my research, I think there's five different

11   facilities there.  I believe there's only one -- and I believe

12   it's Marion -- that is a medium and minimum facility that

13   houses males.  And if the Court -- Mr. Borisov, I've explained

14   to him if the Court recommends Marion in Illinois, that it's

15   just a recommendation.  The BOP will designate him as they

16   appropriately see fit.  But we would appreciate that

17   recommendation.

18       **THE COURT:**  I'm happy to make that recommendation.

19       Anything else?

20       **MR. BUSTAMANTE:**  No, Your Honor.  And thank you.  I've

21   always told my clients, all we want is a fair shot, and I

22   appreciate the fair shot and I appreciate you giving my client,

23   Mr. Borisov, an opportunity to -- you know, he's got to pay the

24   piper but still have an opportunity to move forward.  And we

25   appreciate that.

1    **THE COURT:**  Okay.  When should the continued sentencing

2   hearing take place for Mr. Kopankov?

3    **MR. MICHAEL:**  Your Honor, are you asking me for a

4   suggested time?  If the Court wants supplemental briefing,

5   would the Court want to consider continuing it out for about

6   30 days?

7    **THE INTERPRETER:**  Your Honor, the interpreter may not be

8   available until after March 23rd, in March.

9    **THE COURT:**  Okay.  Well, I'll tell you what.  I'm

10  continuing it.  I'm not going to set a date now.  I'm going to

11  have Kristen work on the scheduling issues, and we will -- we

12  will set a date through an order.  Okay?

13   **MR. MICHAEL:**  That's fine, Your Honor.  My client will be

14  available any date, and I will also be available any date that

15  the Court sets in the near future.

16   Is the Court going to also, in its order, suggest

17  supplemental briefing by the parties?

18   **THE COURT:**  Yes, I will do that.  Yeah.

19   **MS. GRIER:**  And, Your Honor, I retire at the end of

20  this month.  So if it continues into March, I will pass this on

21  to somebody else.  But I will keep in touch with Kristen to

22  make sure our office is aware.

23   **THE COURT:**  Okay.  Thank you.  I forgot about that.

24  I think I probably wanted to forget about that.  Okay.

25   **MR. BUSTAMANTE:**  Your Honor, can I make one further

1   request?  And it may just be a slight housekeeping matter.

2        I know that I've made a request to Pretrial Services so

3   Mr. Borisov can travel to Florida to see his good friend and

4   his godchildren before he self-surrenders.  And my

5   communication with the pretrial services officer was we were

6   going to wait until he was sentenced.

7        And so I'm assuming he just continues with the same

8   pretrial conditions that he had previously.

9        **THE COURT:**  Yes.

10       **MR. BUSTAMANTE:**  Great.  Thank you so much, Your Honor.

11  Appreciate it.

12       **THE COURT:**  And if it's helpful, I don't have a problem

13  with Mr. Borisov doing that.

14       **MR. BUSTAMANTE:**  Thank you, Your Honor.  We appreciate

15  that.

16       Good to see everyone, and thank you.

17       **THE COURT:**  Okay.  Thank you.

18       **MR. MICHAEL:**  Thank you, Your Honor.

19            (Proceedings adjourned at 10:35 a.m.)

20                      ---o0o---

21

22

23

24

25

## <u>CERTIFICATE OF REPORTER</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:  Monday, February 14, 2022

_____

Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
Official United States Reporter